UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

JAMES E. FRANKLIN, JR.,        ]
                               ]
        Plaintiff,             ]
                               ]
    vs.                        ]        7:09-cv-01340-LSC
                               ]
DAVID ABSTON, *et al.*,        ]
                               ]
        Defendants.            ]

MEMORANDUM OF OPINION

I.    Introduction.

Pending is Defendants' motion for summary judgment, filed on

November 2, 2010.  (Doc. 29.)  Because of his incarceration in the Pickens

County, Alabama jail ("jail") Plaintiff Franklin filed this suit alleging various

federal constitutional claims and a state law claim.   Defendants filed a

motion to dismiss which the Court granted in part, dismissing three of the

defendants and many of Franklin's claims.  (Doc. 22.)   The remaining

Defendants David Abston, Debra Abston, Denise Hasty, and Tanya Ray now

move for summary judgment on Franklin's remaining claims: a Fourteenth

Amendment claim asserted via 42 U.S.C. § 1983 for deliberate indifference

to a serious medical condition and a state-law claim for intentional infliction of emotional distress.  (Doc. 29.)  Defendants assert that qualified immunity applies to David Abston, that they were not indifferent to Franklin's medical needs, and that Franklin cannot make out his prima facie case on the state law claim.  The issues raised in Defendants' motion for summary judgment have been briefed by both parties and are now ready for decision.  After considering the legal arguments and presented evidence, Defendants' motion for summary judgment is granted in part.

II.    Facts.[1]

Franklin's incarceration was not his first interaction with Sheriff David Abston of Pickens County, Alabama, and his wife Debra, who also worked in the Sheriff's Department.  In 1993, Sheriff Abston gave Franklin a job with the Sheriff's Department as a dispatcher and jailer. Franklin characterized his working relationship with the Defendants Abston as "so-so." (Doc. 32-1

---

[1]The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party.  *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  These are the "facts" for summary judgment purposes only.  They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

at 11.)  But he functioned less well with his other coworkers: "[A]ll of the deputies that worked [in the Sheriff's department] were back stabbers." (Doc. 32-1 at 12.)  Franklin left the position in 1994 because he disapproved of inmates occasionally waiting more than three days for an initial hearing and perhaps receiving an undesirable cell as punishment for "mouth[ing] off" and because he "didn't like a lot of the people that worked there, [t]oo much stress." (Doc. 32-1 at 13-14.)  In 1998, the Sheriff's Department again hired Franklin as a dispatcher.  But Franklin left this position too.  Tired of his relief arriving late, angered that his complaints failed to remedy the problem, Franklin broadcast his immediately-effective decision to quit over the radio.

Franklin's next interaction with the Pickens County Sheriff's Department occurred when he was detained and charged with molesting his son.  Incarcerated on July 3, 2007, the charges were dropped, and Franklin was released in January 2008.

When he entered the jail, Franklin suffered from chronic arthritis and diabetes.  And his mother and three sisters had died of heart disease.  The arthritis had caused the loss of his finger joints and also had manifested in

degenerative arthritis of his spine.  He was diagnosed in the late 1980s with diabetes, which he first treated with a non-time-released medication that controls blood sugar levels and then later with the time-released version. His doctor had attempted to put him on insulin several times, but Franklin never felt comfortable giving himself shots, as arthritis impaired his dexterity.  His personal doctor encouraged him to eat small meals to keep his blood sugar levels from caroming high to low.  Yet he occasionally strayed from his balanced diet, cheating by consuming sugary and fried foods.  (Doc. 32-1 at 25.)  And he passed out once from low blood sugar and had his blood sugar spike at other times.  (Doc. 32-1 at 20.)

The jail provides its inmates with dietary and medical services. Inmates receive the same meals as jail personnel, totaling three a day, save Sunday's two meals.  For example, on September 18, 2007, breakfast consisted of oatmeal, apples, and biscuits; lunch of chili and cornbread; and dinner of turkey and noodle casserole, okra, and cornbread.  (Doc. 32-14 at 4.)   The okra and about half of the other vegetables served came from the seven-acre prison garden.  (Doc. 32-2 at 29.)

During Franklin's incarceration, the jail provided medical services to

its inmates through several means.  Though, because it housed inmates for a shorter time than prisons, the jail treated urgent medical problems only. The inmates had daily access to a nurse, as-needed access to a doctor, and emergency access to local hospitals.  An inmate desiring medical care would solicit a medical request form from a jailer and submit it to the jailer who then passed it on to Nurse Ray.  Ray, a licensed practical nurse, had an office in the jail and the most contact with inmates.  She worked regular hours from Monday through Friday and remained on-call throughout the weekends.  Ray sifted through medical request forms, prepared medications for inmates, and scheduled appointments with outside medical providers. But she could not prescribe medications.  So when she received medical request forms, Ray would contact the doctor "with every problem that arose" and receive instructions on how to treat the inmates.  (Doc. 32-5 at 8.)

Dr. Manley Sullivan served as the jail doctor.  Dr. Sullivan went to the jail when inmates needed him and had an office there.  When he was not at the jail, Dr. Sullivan worked less than two miles from the jail, at the Pickens Country Medical Center.  Dr. Sullivan would determine whether to give

treatment advice telephonically to Ray or to have her schedule an in-person appointment.  And Dr. Sullivan wrote prescriptions for inmates.

When Franklin entered the jail, Ray performed a medical assessment for him—noting his medications, securing a release for his medical records, and changing his white bread portions to wheat bread to accommodate his diabetes.  Dr. Sullivan prescribed Franklin 10 milligrams of Glipizide—a medicine he had previously taken—for his diabetes, which Dr. Sullivan later reduced to 5 milligrams.   During the first five months of his six-month incarceration, the jail's records reveal that he submitted twenty-nine medically related forms—covering subjects from possible staph infections to requests for increased pain medication to toilet paper requests.  As Franklin himself admits, this is a "multitude of medical request forms/complaints." (Doc. 36 at 33.)  Ray annotated twenty-four of the forms with her response. For example, on one form, Ray notes the treatment for Franklin's staph infection and the rumor that Franklin had been "taking things from the trash that other inmates w/staph had used [and] rubbing it on his face [and] body." (Doc. 32-11 at 19.) The forms chronicle many incidents that form the basis of Franklin's complaints.

On a September 29, 2007 form, Franklin complained that he could not sleep well without his extra mattress, which the guards had taken during a shakedown supervised by Denise Hasty. (Doc. 32-11 at 16.)  Hasty served as one of two shift supervisors at the jail.  During a shakedown, the jail staff removes all mattresses, checks them for contraband, cleans them, and returns the permitted mattresses.  But jail policy allows extra mattresses for medical reasons only, cleared by the medical staff.   Franklin does not suggest that he had medical clearance for the original extra mattress.  After a few weeks waiting for approval, Ray secured Franklin an extra mattress.

On another form, Franklin writes "[t]his food [prison food] is not suppose to be what a diabetic is suppose to eat." (Doc. 32-11 at 4.)  While in jail, Franklin could purchase snacks from the commissary.  A July 25, 2007 receipt reflects the following: two Snickers, one bag of Cheetos, two oatmeal cookies, two fudge brownies, three peanut butter cookies, two chocolate creme cookies, an apple ugly, and a cinnamon roll.  (Doc. 32-15 at 2.)

Another form refers to Franklin's fall in October 2007, during which he chipped two teeth by falling down some stairs in the jail's common area,

evidently the result of a wet floor.  Either Debra Abston or a jailer called an ambulance for Franklin.  She rode with him to the Pickens County Medical Center and stayed with Franklin.  The same evening the hospital released him after diagnosing a cut and bruised nose and giving him Motrin for his shoulder pain.

Franklin provides a journal recording his medical issues—including the fall—throughout his time in jail.  For example, in one entry Franklin writes that "[he] feel[s] bad all the time." (Doc. 37-9 at 31.)  In another, he states that the jail's heating had broken but that "[w]e were given . . . a second blanket so we could stay warm." (Doc. 37-9 at 34.)  But most entries address his daily medications, digestive problems, and other maladies.  Beginning in October and continuing through January 2008, he noted chest pains.

In January, the jail released him.  A week after his release, Franklin underwent quadruple bypass surgery and suffered a collapsed lung.  And he receives counseling for the stress caused by the child molestation charges.  He filed this lawsuit against the current Defendants and various other jail personnel in July 2009.  But he did not name Dr. Sullivan as a defendant, even though he asserts the unconstitutionality of the jail's provided medical

care.

III.    Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23.  In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party.  *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

IV.   Analysis.

A.   Deliberate Indifference.

"Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  Rather, deliberate indifference to a prisoner's serious medical needs contravenes the Eighth Amendment of the Constitution.  *Estelle*, 429 U.S. at 104.  But the Fourteenth Amendment rather than the Eighth Amendment applies to pretrial detainees like Franklin.  *Snow ex rel. Snow v. City of Citronelle, AL*, 420 F.3d 1262, 1268 (11th Cir. 2005).  The

pertinent standards are the same for either amendment.  *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007).  Section 1983 thus creates a cause of action whether doctors act indifferently or whether prison guards deny care or intentionally interfere with prescribed treatment. *Estelle*, 429 U.S. at 105.

To recover on this cause of action, a prisoner must make three showings: (1) a serious medical need; (2) the prison official's deliberate indifference to that need; and (3) the prison official's personal participation in the constitutional violation.  *Goebert*, 510 F.3d at 1326-27.

A serious medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994).  A serious medical need is one that poses a substantial risk of serious harm, if left unattended. *Farrow v. West*, 320 F.3d 1235, 1244 (11th Cir. 2003).  Franklin offers as serious medical needs his diabetes, arthritis, vertigo, head injury, staph infections, allergic reactions, chest pain complaints, hurting gums, and shortness of breath.  (Doc. 36 at 35-36.)   Defendant does not dispute

that Franklin has serious medical needs.

Deliberate indifference requires three sub-elements: (A) that a prison official knows the risk of serious harm; (B) that the official disregards that risk; and (C) that the official's conduct exceeds gross negligence. *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005). "The meaning of 'more than gross negligence' is not self-evident," but case law develops the concept. *Goebert*, 510 F.3d at 1327.

Franklin must show that Sheriff Abston, Debra Abston, Nurse Ray, and Hasty knew that a risk of serious harm existed. He must present evidence of each official's subjective awareness of the risk to survive summary judgment. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). Ray was of course aware of Franklin's serious medical problems, including the serious risk of cardiovascular harm. Franklin's journal and his testimony suggest that he sent his complaints of chest pains to Ray, no other Defendant. Ray acknowledges that she assesses any complaints of chest pain. She had access to Franklin's medical records, knew he had high blood pressure, and had worked at a "cardiovascular place" for seven years. (Doc. 32-5 at 15.)   Franklin meets his burden of showing Ray's subjective

knowledge that Franklin bore a serious risk of cardiovascular harm.

Regarding the other defendants, Franklin provides scant evidence suggesting that they knew of his diagnosed conditions.  Debra Abston was uncertain if she had learned of Franklin's arthritis during his incarceration or during the litigation.  (Doc. 32-4 at 16.)  And she cannot remember ever discussing his blood sugar or having "any discussions with either Dr. Sullivan or Nurse Ray about James Franklin in any capacity."  (Doc. 32-4 at 17.) Franklin also has failed to meet his burden of showing Hasty's knowledge of severe harm.  She does not remember Franklin's arthritis, his chest pains, or his allergic reactions.  (Doc. 32-7 at 23.) At most the presented evidence shows that Abston and Hasty may have been aware of Franklin's medical issues, but nothing indicates that they knew the issues' seriousness.

In addition, Franklin has failed to show that Sheriff Abston knew a risk of serious harm existed.  Sheriff Abston testified that "[i]t seemed like [Franklin] mentioned something about his blood sugar, but not often." (Doc. 32-3 at 6.)  Sheriff Abston also said "[Franklin] may have mentioned [diabetes] to me one time."  (Doc. 32-3 at 7.)  But Sheriff Abston did not know about Franklin's arthritis and had little knowledge of Franklin's other

conditions: "[the medical staff was] meeting the needs of what [Franklin's] got on there. . ." (Doc.32-3 at 7.)  Whatever subjective knowledge that the Abstons and Hasty might have possessed, Franklin must also meet his burden on the final two elements.

Under the final two sub-elements, claims of deliberate indifference fall into three categories—no medical care, delayed medical care, and bad medical care.  Franklin makes claims in all three categories.

### 1.    No Medical Care.

First, "official[s] act[] with deliberate indifference when [they] know[] that an inmate is in serious need of medical care, but [they] fail[] or refuse[] to obtain medical treatment for the inmate." *Lancaster v. Monroe Cnty., Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997).  Franklin suggests that by "disregard[ing] his injuries stemming from his fall in the jail," and by not responding to his complaints of chest pain, Defendants' actions fall into this category.  (Doc. 36 at 38.)  But Franklin fails to provide evidence that he seriously needed medical care from the jail.  The Pickens County Medical Center deemed Motrin, an over the counter pain medication, sufficient for Franklin's pain after his fall.  His fall occurred on October 11, 2007; he

submitted a medical request form five days later: "Tonya [Ray], I am still having headaches and pains shooting through my head. I need to see how much the dentist charges . . ." (Doc. 32-11 at 21.) Ray testified that "[she] did inform Dr. Sullivan" of Franklin's complaints about headaches. (Doc. 32-6 at 29.) Franklin fails to mention headaches on his next request form, sent twelve days later, or on subsequent request forms. (Doc. 32-11 at 22-30.) Dr. Sullivan elected not to follow up with Franklin, suggesting that the headaches were not serious. Franklin ceased complaining of them, suggesting the same.

Franklin's own journal states that he complained of chest pain to Ray on October 21, 2007, who did nothing. (Doc. 37-9 at 17.) He testifies to at least two other occasions—November 22 and January 8—on which he submitted forms to Ray complaining of chest pains. (Doc. 32-1 at 51, 53.) The jail's records do not contain these forms. (Doc. 39 at 18.) His journal corroborates his testimony: "I wrote a request to LPN Tonya Ray telling her about pain [and] numbness in my heart and being short of breath." (Doc. 37-9 at 38.) But Ray does not remember any verbal or written complaints of chest pain from Franklin. (Doc. 32-6 at 30.) (Doc. 32-6 at 30.) And Ray

testified that she "immediately assessed any chest pain complaints."

Ray states that all chest pain complaints require attention. In Franklin's case, he contends that he complained of chest pains on January 8, 2008; he then had quadruple bypass heart surgery on January 16, 2008. Over two months passed, according to Franklin, during which no one took any action regarding his chest pains.  Ignoring multiple complaints of chest pain by someone bearing a family history rife with heart disease, by someone suffering from diabetes, constitutes deliberate medical indifference.  But Ray does not remember any complaints.  A genuine dispute of material fact thus exists, rendering summary judgment inappropriate on Franklin's deliberate medical indifference claims regarding his complaints of chest pain.

> 2.    Delayed Medical Care.

Next, even if officials provide care, "delaying the treatment of serious medical needs" constitutes deliberate indifference. *McElligott*, 182 F.3d at 1255.  But, of course, a tolerable delay—depending on the delay's reason and the need's nature—fails to constitute deliberate indifference. *Bozeman*, 422 F.3d at 1273. Franklin suggests that the delay in treating his

staph infection falls into this category.  Though Dr. Sullivan waited to use antibiotics to treat Franklin's infections, he prescribed a course of warm compresses.  Ray stated that "a lot of times [staph sores will] heal up on their own." (Doc. 32-6 at 19.)  Because the sores failed to heal, Dr. Sullivan ordered antibiotics to treat Franklin.  (Doc. 32-6 at 19.)  Franklin ceased mentioning staph sores and began mentioning digestive problems. (Doc. 32-11 at 25.)  Though untreated staph infections can cause serious problems, Ray did not delay Franklin's treatment. Rather, she and Dr. Sullivan treated him with cost-effective alternatives before using antibiotics.  Regardless, the treatment worked, eliminating Franklin's sores.

### 3.    Grossly Inadequate Medical Care.

And finally "deliberate indifference may be established by a showing of grossly inadequate care as well as by a decision to take an easier but less efficacious course of treatment." *McElligott*, 182 F.3d at 1255. But "when a prison inmate has received medical care, courts hesitate to find  [a constitutional] violation." *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989.)  Franklin suggests that the care given for his diabetes, fall, vertigo, allergic reactions, and arthritis falls into this category.  He argues "that the

medications provided were not adequate." (Doc. 36 at 37.) Even though Nurse Ray administered about eighteen different medications in an effort to treat Franklin, even though Ray responded to over twenty requests for specific care, Franklin suggests Ray's actions constitute grossly inadequate care. (Doc. 32-9.)

> i.   Diabetes.

Addressing his diabetes, Franklin contends that Defendants provided him with an inadequate diet, supplied inferior medication, and conducted poor monitoring of his blood sugar. Franklin's first formal complaint about the jail's food occurred on August 20, 2007: "This food is not suppose to be what a diabetic is suppose to eat." (Doc. 32–11 at 4.) This complaint coincided with his stating on the same form that "I am out of store items. I can no longer afford the commissary." (Doc. 32-11 at 4.) Yet two days later, Franklin managed to purchase a butterscotch and an apple ugly at the commissary. (Doc. 32-15 at 3.) His spree eleven days before his complaint about the jail food consisted of the following: two bags of Cheetos, three peanut butter cookies, six apple uglies, four jalapeno sourdough pieces, two fried apple pies, and three packages of noodles. (Doc. 32-15 at 3.)

Franklin nevertheless asserts that the jail's meals constitute a deliberate indifference to his diabetes because his doctor suggested a diet of fruit, vegetables, and lean protein.  (Doc. 32-1 at 20.)  But the jail's diet complements the diet Franklin reports that his doctor recommended, much more than his self-administered diet.  Ray switched Franklin to wheat bread, the jail had a seven acre garden, the dinner menu for the second week of September 2007, provided okra, green beans, cabbage, salad, or corn every night, and finally, the jail provided the following protein for dinner: turkey, chicken, northern beans, cubed steak, and baked chicken. (Doc. 32-14 at 2.)

   Franklin next argues that Ray provided "an inappropriate diabetic medication." (Doc. 36 at 37.)  He contends that he "was supposed to be on Glipizide XL which is time released, which is more expensive." (Doc. 32-1 at 42.)  Franklin states that he used to take Glipizide: "At one time I was on Glipizide and then [his personal doctor] put me on the time released which is the Glipizide XL."  (Doc. 32-1 at 42.)  Frankin managed to control his diabetes, "[f]or the most part," while taking these medications.  (Doc. 32-1 at 20.)

   Dr. Sullivan prescribed Glipizide for Franklin; Franklin stated that his

own doctor had prescribed Glipizide in the past. Dr. Sullivan later reduced Franklin's prescription to five milligrams of Glipizide.   Though Franklin now quibbles over the amount of medication Dr. Sullivan prescribed,  Franklin fails to mention the new dosage as a problem in any request form.  (Doc. 32-11 at 22-30.)  Disputing the proper dosage remains—in any event— closer to a medical malpractice claim, not a claim for unconstitutional medical indifference.

Franklin contends that the Pickens County medical staff inappropriately monitored his diabetes because his blood sugar plummeted on five occasions. (Doc. 36 at 37.)  The jail did not always schedule Franklin for regular testing of his blood sugar levels.   One occasion, in which Franklin's blood sugar plummeted causing unresponsiveness, required Ray to treat Franklin with a Glucogen injection.  (Doc. 32-6 at 3.)  Another, on November 15, 2007, required Ray to treat Franklin with glucose tablets. (Doc. 32-6 at 4.)   The other three times required more moderate treatment—food.  (Doc. 32-6 at 5.)

But, in July 2007, Ray responded to Franklin's complaint of low blood sugar by allowing him to "request [ a check] when feels low."  (Doc. 32-11

at 2.)  Franklin could request that the jailers check his blood sugar level, at any time.   (Doc. 32-6 at 6.)   And Pickens County trained jailers for emergency use of the glucose tablets and the injection.  (Doc. 32-6 at 2-3.) Prior to incarceration, Franklin passed out from low blood sugar without emergency care present.  But "[t]he people that run the restaurant right in front of the apartment I lived called an ambulance and they took me to the emergency room."  (Doc. 32-1 at 21.)  Franklin suffered diabetic episodes before incarceration without access to emergency care; he suffered diabetic episodes during incarceration that emergency care treated.   Because Franklin could request a blood sugar check from a jailer, because he had better access to emergency care than he did prior to incarceration, Franklin cannot show the required "grossly inadequate care."  *McElligott*, 182 F.3d at 1255.

ii.     The Fall.

After Franklin's fall, Pickens County Medical Center noted that he arrived with headache and shoulder pain.  (Doc. 32-12 at 2.) The medical center glued shut the "upside down U-shaped superficial laceration to the bridge of his nose" and provided the following plan: "He is to follow-up with

the physician per the Sheriff's Department and otherwise return here for any acute changes." (Doc. 32-12 at 2.) Pickens County also provided Franklin a form that gave advice to patients with various types of injuries.  (Doc. 32-12 at 7.)  Though Franklin had no sutures, he suggests that the portion of the form labeled "sutured lacerations" and providing "3. Watch for signs of infection: . . . d. Pain. . ." applies to him.  (Doc. 32-12 at 7.)

Franklin's medical request form described his problem as "still having headaches and pain shooting through [his] head."  (Doc. 32-11 at 21.)  He does not suggest what "acute changes" occurred.  He had headaches when he entered the medical center; the headaches lingered after he left the center.  The medical center form goes on to advise patients to contact their physician if pain occurs as a sign of infection.  Franklin alerted Ray.  She, in turn, informed Dr. Sullivan of Franklin's complaints.  Dr. Franklin elected to continue with the treatment the medical center suggested.  (Doc. 32-6 at 29.)  Franklin presents no evidence of any infection and his medical request forms move on to matters other than pain.  (Doc. 32-11 at 22-30.)  Franklin cannot show that Ray's post-fall care amounted to deliberate indifference.

iii.   Vertigo.

Franklin claims that Defendants improperly treated his vertigo, resulting in increased dizziness and causing him to feel light-headed.  Before incarceration, Franklin took prescription-strength meclozine for his vertigo. (Doc. 32-1 at 42.)  Franklin asserts that Dr. Sullivan put him on the cheaper over-the-counter version of meclozine: "I've taken both of them, and you have inner ear, you have dizzy bouts with the over-the-counter." (Doc. 32-1 at 43.)

On October 11, 2007, Franklin submitted a form accusing Ray: "You have substituted a generic meclozine for my regular meclozine."  (Doc. 32-11 at 20.)  Ray responded: "the meclozine did not change." (Doc. 32-11 at 20.)  Ray later warned Franklin: "You are almost out of your meclozine and it will be next week before I can talk to Dr. Sullivan about a prescription. Do I put it out for twice daily instead of four times daily so you would not be totally without it[?]" (Doc. 32-11 at 27.)  Eleven days later she alerted Franklin that she had obtained a refill.  (Doc. 32-11 at 29.)

Rather than exhibiting deliberate indifference to Franklin's vertigo, Ray provided him with his medicine, advised him of dwindling supplies and got the prescription refilled for him.  Plaintiff cannot carry his burden of

Page 23 of  33

showing that Ray acted with more than gross negligence in treating his vertigo.

### iv.   Allergic Reactions.

On September 29, 2007, Franklin stated in a request form that "I still have this rash (2 weeks now). All over my legs and feet.  And its not going away." (Doc. 32-11 at 16.)  Two days later he stated "Tonya, my rash is going away."  (Doc. 32-11 at 17.)  On October 11, 2007, he submitted another form: "Tonya, I am breaking out in the red rash again.  I think I am allergic to the staff antibiotics."    (Doc. 32-11 at 19.)  In response, Dr. Sullivan and Ray changed Franklin's antibiotics.  (Doc. 32-11 at 19; Doc. 32-6 at 27.)  Franklin contends that "Defendants . . . twice gave him medication for same to which he had an allergic reaction resulting in a rash all over his body."  (Doc. 36 at 38.)  Yet he fails to provide evidence suggesting how a physician's observing a rash, waiting to see how it manifested, and then treating the rash, constitutes medical indifference.  In any event, the person Franklin holds responsible, Ray, could not write prescriptions.

### v.   Arthritis Pain.

Franklin suggests that Ray "subjected Plaintiff to increased pain."

(Doc. 36 at 38.)  Specifically, Franklin argues that Ray mistreated the pain stemming from Franklin's arthritis by allowing removal of his extra mattress and by ignoring Franklin's complaints of pain.

Franklin contends that "[he] was left to bear the pain for over a month before Ray returned his mattress."  (Doc. 36 at 38.)  But Franklin does not dispute that he had a mattress and that Ray requisitioned him an additional one.  After Franklin lost his apparently unauthorized extra mattress in a shakedown, Ray had him sign a release so that she could get his medical records[2] and re-approve the extra mattress.  (Doc. 32-5 at 32.)  And "[b]ecause it was taking an unreasonable amount of time to get the records," Ray violated a verbal policy against making decisions without records and approved the mattress for Franklin. (Doc. 32-5 at 32.)  Though not required to, Ray nevertheless helped Franklin.   A few weeks' delay in getting him an extra mattress on which to sleep is not the kind of deliberately indifferent medical care that violates Franklin's constitutional

---

[2] Franklin insinuates that Ray should have requested the records earlier.  (Doc. 36 at 12, 28.)  But as Franklin states, "Ray has my Doctor records which might not show a lot.  Dr. Richardson [his personal doctor] does not keep very good records."  (Doc. 32-11 at 22.)  Franklin saw little need for the records—as did Ray.

rights.

Before his incarceration, Franklin had taken Ultram for his pain.  (Doc. 32-5 at 11.)  Throughout his incarceration, Franklin received Ultram for pain stemming from his arthritis and Naproxen for the inflammation associated with his arthritis.  (Doc. 32-9 at 10-11.)  In October 2007, Ray advised Franklin that Dr. Sullivan changed the Ultram to a different brand without changing the medication.  (Doc. 32-11 at 20.)  The Court also notes Franklin's contention that Ray and Dr. Sullivan refused to put him on "Celebrex . . . instead of the Naproxen they were giving him which was not sufficient for his arthritis condition."  (Doc. 36 at 13.)  Yet after incarceration, Franklin still takes naprosyn, an identical medication to Naproxen.  (Doc. 36 at 18.)  Franklin argues that Ray ignored his pain complaints.   But Ray was treating Franklin's pain, every day, with medications prescribed to him before incarceration and approved by Dr. Sullivan.  (Doc. 32-9 at 2-16.)  Franklin cannot establish that Ray's actions regarding his pain management constitute deliberate indifference.

In sum, Defendants did not delay Franklin's care or subject him to grossly inadequate care.  Franklin received prescribed medications; the

medical staff attempted different treatments when some provided little help or caused other problems; the medical staff performed emergency services for him—preventing him from lapsing into a diabetic coma and taking him to the emergency room; and the jail provided a more balanced diet than he consumed when allowed to resort to his own funds.  But the factual issue of whether Franklin complained of chest pain to Ray renders summary judgment inappropriate on the legal issue of whether Ray was deliberately indifferent to Franklin's serious cardiovascular problems.

B.     State Law Outrage Claim.

Franklin claims that Nurse Ray and Denise Hasty's actions during his incarceration reach the level of outrage.  (Doc. 36 at 42.)  The tort of outrage requires a plaintiff to establish that the defendant's conduct was intentional or reckless, extreme, and outrageous, and that it caused "emotional distress so severe that no reasonable person could be expected to endure it."  *Ex parte Crawford & Co.*, 693 So. 2d 458, 460 (Ala. 1997). Nurse Ray and Hasty's actions, in short, must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized

society." *Am. Road Ser. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980).

Defendants' actions fall well short of these requirements.  Franklin cannot meet his burden.  Franklin does not suggest that Hasty and Ray physically attacked him, does not suggest they withheld food from him, and does not suggest they attempted to coerce or intimidate him.  Rather, as stated previously, Ray provided Franklin with over fifteen different medications in an effort to treat him and his numerous illnesses, provided emergency care when Franklin lost consciousness, violated policy to get him another mattress, ensured his transport to the emergency room for a "superficial laceration," and responded to over twenty requests for specific care. (Doc. 32-12 at 2.)

Though Franklin fails to point to specific conduct by Ray or Hasty in his arguing outrage, Franklin nevertheless appears to rely on Ray's following statement, attempting to show improper conduct: "The meclozine did not change . . . This medication has nothing to do with the vertigo so you can quit complaining."  (Doc. 32-11 at 21.) But Ray responded to Franklin's accusing her: "You have substituted a generic meclozine for my regular meclozine." (Doc. 32-11 at 21.)  And the medical request form was one of

two Franklin sent out on October 11, 2007.  At that point, Franklin had requested adjustments to medication, complained of pain that the jail provided him medication for, and spilled dozens of words begging for lotion: "I have run out of lotion. My feet are very dry . . . . And you know that I have to take care of my feet. . . . I need lotion so my feet will not start cracking."  (Doc. 32-11 at 9.)  Ray got him the lotion.  Her admittedly inappropriate (Doc. 32-6 at 16) reaction to that accusation seems reasonable, far from outrageous.

Franklin appears to assert the outrageousness of Hasty's overseeing the removal of his extra mattress.  But jail policy requires medical permission.  (Doc. 32-5 at 31-32.) Franklin does not contend that he had permission.  Ray eventually gave him that permission.  Regardless, Franklin already had a mattress.  Depriving a prisoner of his extra mattress until medical approval arrived falls short of the required outrageous conduct.  No conduct intolerable in civilized society exists here.

C.    State Agent Immunity.

Ray and Hasty raise state agent immunity.  (Doc. 31 at 33.)  State agent immunity protects state employees from state law claims. *See Brown*

*v. City of Huntsville, Ala.*, 608 F.3d 724, 740 (11th Cir. 2010).  Franklin does

not dispute that Ray and Hasty were performing a discretionary function:

their roles at the jail.  (Doc. 36 at 44.) Franklin instead argues that  state

agent immunity does not apply because Hasty and Ray engaged in willful or

malicious conduct.  (Doc. 36 at 44).  Franklin's state law outrage claim

requires conduct beyond negligent or wanton behavior.  If Hasty and Ray's

conduct rose to the level of outrage, then immunity would not apply.  But

Hasty and Ray did not engage in the willful or malicious conduct required for

the state law outrage claim, as shown in Part 4.B.  The Court thus need not

decide the issue of state agent immunity.

> D.    Supervisory Liability.

Franklin asserts claims against Sheriff Abston as supervisor of the jail.

(Doc. 36 at 32.)  "The standard by which a supervisor is held liable in his

individual capacity for the actions of a subordinate is extremely rigorous."

*Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003).  Franklin must show

that Sheriff Abston "(1) instituted a custom or policy which resulted in a

violation of the plaintiff's constitutional rights; (2) directed his subordinates

to act unlawfully; or (3) failed to stop his subordinates from acting

unlawfully when he knew they would." *Gross v. White*, 340 Fed. App'x 527, 531 (11th Cir. 2009) (citing *Goebert*, 510 F.3d at 1331.)   But as shown previously, Franklin fails to meet his burden regarding any Defendant, save Ray.  And Franklin provides no evidence suggesting Sheriff Abston even knew about Franklin's alleged complaints of chest pains, much less instituted a policy of ignoring medical requests.  Rather, Sheriff Abston told Ray to "[b]e sure you check [Franklin]."  (Doc. 32-3 at 10.)  And when asked about the content of Franklin's submitted forms, Sheriff Abston stated that "I don't remember anything."  (Doc. 32-3 at 10.)  In any event, Franklin himself points out that many of Sheriff Abston's policies "are . . . not adhered to," which would, of course, prevent Sheriff Abston from instituting a policy that would violate a prisoner's rights.  (Doc. 36 at 33.)  Franklin does not demonstrate supervisory liability against Sheriff Abston.

E.    Qualified Immunity.

Defendants assert that qualified immunity protects them; Franklin does not dispute that Defendants acted within their discretionary authority. (Doc. 31 at 17-18.)  Qualified immunity "offers complete protection for government officials sued in their individual capacities if their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002).   The Supreme Court established that deliberate indifference to prisoners' serious medical needs violates a constitutional right.   *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).   As stated above, summary judgment is inappropriate on whether Ray acted deliberately indifferent to Franklin regarding his chest pains.  Qualified immunity thus does not apply to Ray on that specific issue.  But, of course, Defendants Debra Abston, Sheriff Abston and Denise Hasty were not deliberately indifferent to Franklin's serious medical needs.  The Court thus need not decide the issue of qualified immunity as it pertains to Defendants Debra Abston, Sheriff Abston and Denise Hasty.

V.    Conclusion.

For the reasons stated above, Defendants' motion for summary judgment on Plaintiff's claims is GRANTED IN PART.  Franklin's claim for deliberate indifference involving Nurse Ray and her alleged non-response to his chest pains remains.  All other Defendants are DISMISSED from the action.  A separate order will be entered that conforms to this Opinion.

Done this <u>15</u><sup>th</sup> day of <u>March 2011</u>.

_____

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

159890